## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, 2100 L Street, NW Washington, DC 20037, | ) ) ) ) ) Civ. No._____ |

THE HUMANE SOCIETY OF THE   )
UNITED STATES,   )   Civ. No._____
2100 L Street, NW   )
Washington, DC 20037,   )
   )
DEFENDERS OF WILDLIFE,   )
1130 17th Street, NW   )
Washington, DC 20036,   )
   )
WHALE AND DOLPHIN   )
CONSERVATION SOCIETY,   )
7 Nelson Street   )
Plymouth, MA 02360   )
   )
        Plaintiffs,   )
   )
   v.   )
   )
NATIONAL MARINE FISHERIES   )
SERVICE,   )
Northeast Regional Office   )
55 Great Republic Drive   )
Gloucester, MA 01930,   )
   )
ERIC SCHWAAB,   )
NOAA Assistant Administrator   )
   for Fisheries   )
National Marine Fisheries Service   )
1315 East-West Highway   )
Silver Spring, MD 20910,   )
   )
JOHN BRYSON,   )
Secretary of Commerce   )
U.S. Department of Commerce   )
14th Street & Constitution Ave., NW   )
Washington, DC 20230,   )
   )
        Defendants.   )
   )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Each year, critically endangered North Atlantic right whales and endangered humpback, fin, and sei whales become entangled in commercial fishing gear.  In these incidents, fishing line wraps around whales' heads, flippers, or tails, often impeding basic movement, feeding, and reproduction, causing infection, and sometimes preventing the animals from resurfacing, resulting in drowning.

2.      The North Atlantic right whale is one of the world's most endangered large whales, with an estimated population of less than 400 individuals.   In fact, the National Marine Fisheries Service ("NMFS") has previously stated that the "loss of even a single individual may contribute to the extinction of the species."  69 Fed. Reg. 30,857, 30,858 (June 1, 2004).  NMFS has cited entanglements in commercial fishing gear as one of the most significant threats to the right whale's survival and recovery.  Yet, almost every year since 2002, at least one entangled right whale has been found dead or so gravely injured that death is deemed likely. Entanglements also continue to threaten the recovery of endangered humpback, fin, and sei whales.

3.      Nevertheless, and only after litigation over NMFS's nine-year delay in completing consultation, NMFS issued four biological opinions on October 29, 2010 that conclude that the continued operation of four federal fisheries—the American Lobster Fishery, the Northeast Multispecies Fishery, the Monkfish Fishery, and the Spiny Dogfish Fishery (collectively, "the fisheries")—is not likely to jeopardize the continued existence of any listed species.

4.      NMFS's 2010 Biological Opinions all acknowledge that the operation of the fisheries will result in the deaths and serious injuries of critically endangered right whales, as well as endangered humpback, fin, and sei whales, yet none of the fisheries has received required authorizations for these takings pursuant to the Endangered Species Act ("ESA") or the Marine Mammal Protection Act ("MMPA").

5.      Indeed, so far in 2011 there have been at least seven new right whale entanglements, ten new humpback entanglements, and at least two right whales have died from entanglement-related injuries.

6.      The agency's continued authorization of these fisheries that it acknowledges will cause the take of endangered species without an incidental take statement violates Section 9 of the ESA.  16 U.S.C. § 1538.  The agency's continued authorization of these fisheries that it acknowledges will cause the take of marine mammals without a take authorization pursuant to Section 101(a)(5)(E) of the MMPA, is also arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with the MMPA, in violation of the APA, 5 U.S.C. §§ 701–706.

7.      Furthermore, NMFS's "no jeopardy" determinations in the 2010 Biological Opinions were founded on the assumption that operation of the federal fisheries would result in only *one* death or serious injury of right whales per year.  However, since NMFS issued the 2010 Biological Opinions on October 29, 2010, at least *six* right whales are believed to have died, *two* of whom died after being entangled in fishing gear.

8.      These recent deaths, serious injuries, and entanglements demonstrate that NMFS's key assumption underlying its "no jeopardy" finding for right whales is erroneous and thus that its 2010 Biological Opinions are arbitrary, capricious, an abuse of discretion, or

3

otherwise not in accordance with law, in violation of the Administrate Procedure Act.  5 U.S.C. § 706(2).

9.      Moreover, despite this new information revealing effects of the action that may affect endangered whales to an extent not previously considered, NMFS has failed to reinitiate consultation as to the effects of these fisheries on endangered whales, as required by the ESA's implementing regulations.  50 C.F.R. § 402.16(b).  By failing to reinitiate consultation, NMFS cannot meet its duty to insure that the continued operation of these federally-authorized fisheries is not likely to jeopardize the continued existence of endangered whales, in violation of the ESA and its implementing regulations.  16 U.S.C. §§ 1536(a)(2), 1536(b); 50 C.F.R. § 402.16.

10.      Plaintiffs seek an order of this Court compelling NMFS to (1) reinitiate and complete consultation regarding the effects of the American Lobster, Northeast Multispecies, Monkfish, and Spiny Dogfish Fisheries on endangered North Atlantic right whales, humpback whales, fin whales, and sei whales, in order to insure the fisheries are not likely to jeopardize the species' continued existence as required by the ESA, (2) complete the analyses necessary to determine whether take of these endangered whales may be legally authorized pursuant to the ESA and MMPA, and (3) require operation of the fisheries in compliance with any mitigation measures necessary to insure compliance with both the ESA and the MMPA .

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which grants the district courts original jurisdiction over "all civil actions arising under the . . . laws . . . of the United States."

12.     Pursuant to 16 U.S.C. § 1540(g)(2)(C), Plaintiffs provided the Secretary of Commerce with notice of its ESA violations on April 29, 2011, more than 60 days prior to the commencement of the First and Fourth Claims for Relief.

13.     Venue in this Court is proper under 28 U.S.C. § 1391(e).

## PARTIES

14.     Plaintiff The Humane Society of the United States ("The HSUS") is a non-profit organization headquartered in Washington, D.C.  The HSUS is the nation's largest animal protection organization, with over 11 million members and constituents, including over 300,000 members and constituents who reside in the Commonwealth of Massachusetts.  The HSUS is committed to the goals of protecting, conserving, and enhancing the nation's wildlife and wildlands, and fostering the humane treatment of all animals.  In furtherance of these goals and objectives, The HSUS and its members have demonstrated a strong interest in the conservation and humane treatment of marine mammals, including the North Atlantic right, humpback, fin, and sei whales.  For example, The HSUS has served as a member of the Atlantic Large Whale Take Reduction Team since its inception in 1996, actively participating in efforts to protect large whales from entanglement in fishing gear.

15.     The HSUS brings this action on behalf of itself and its members, who regularly engage in educational, recreational, and scientific activities involving right, humpback, fin, and sei whales.  Many HSUS members live in close proximity to and frequently visit various portions of the Atlantic coast and regularly view or attempt to view these whales.  HSUS members regularly whale watch both from the shore and from boats, including commercial whale watching vessels.  HSUS members plan to continue to observe these whale species in the future.

5

16.     Plaintiff Defenders of Wildlife ("Defenders") is a national non-profit organization dedicated to the protection and restoration of all native wild animals and plants in their natural communities.  Based in Washington, D.C., and with offices spanning from Florida to Alaska, Defenders has nearly one million members and supporters across the nation, including over 142,000 members in states along the Atlantic Coast of the United States where right, humpback, fin, and sei whales live, feed, breed, and migrate.  Defenders is a leader in the conservation community's efforts to protect and recover these endangered whale species.

17.     Defenders brings this action on behalf of its members, many of whom enjoy observing, photographing, and appreciating Atlantic large whales in the wild, and studying the species in their natural habitats.  Defenders' members regularly engage in these activities in various locations along the Atlantic Coast and will continue to do so in the future.

18.     Plaintiff Whale and Dolphin Conservation Society ("WDCS") is the world's largest organization dedicated solely to the protection of whales, dolphins, porpoises, and their environment.  WDCS has offices in the U.K., U.S., Australia, and Germany with over 80,000 supporters world-wide.  WDCS is internationally recognized as a respected source of information for the scientific, biological, political, and legal aspects of cetacean protection. WDCS actively campaigns against practices harmful to cetaceans and their habitat through conservation, research, education programs, and legal advocacy.  WDCS and its supporters have worked extensively to preserve critically imperiled North Atlantic right whales and the habitat upon which they depend.

19.     WDCS brings this action on behalf of its members, many of whom enjoy observing, photographing, and appreciating North Atlantic right whales, as well as humpback, fin and sei whales in the wild, and studying the species in their natural habitats.  WDCS works

with commercial whale watching companies through its Whale SENSE program and WDCS

members and interns also regularly whale watch from land and water.  WDCS members

regularly comment on federal register notices regarding the protection and conservation of North

Atlantic right whales and other endangered whales.

20.     Defenders', HSUS's, and WDCS's members' derive scientific, recreational,

health, conservation, spiritual, and aesthetic benefits from endangered whales.  Their interests in

observing, studying, and appreciating these species are harmed by Defendants' failure to comply

with the ESA, MMPA, and APA.  NMFS has acknowledged that reducing the number of right,

humpback, fin, and sei whale entanglements is essential to each species' survival and recovery.

Defendants are threatening the already-fragile existence of endangered North Atlantic right,

humpback, fin, and sei whales by undermining and denying much-needed protections for these

whales and by authorizing actions that result in take of the species.  These violations and their

contribution to the continued stalled recovery of right, humpback, fin, and sei whales harm, and

will continue to harm, Plaintiffs' and their members' interests in the conservation of these

species.

21.     Plaintiffs' and their members' injuries will be redressed by an order of this Court

compelling NMFS to complete the required ESA and MMPA analyses regarding the effects of

the American Lobster, Northeast Multispecies, Monkfish, and Spiny Dogfish Fisheries on

endangered North Atlantic right, humpback, fin, and sei whales, and insure that operation of the

fisheries are conducted in compliance with any mitigation measures necessary for compliance

with the ESA and MMPA.

22.     Defendant National Marine Fisheries Service ("NMFS") is the agency within the

U.S. Department of Commerce's National Oceanic and Atmospheric Administration to which

the Secretary of Commerce has delegated the authority to conserve and manage most endangered and threatened marine species pursuant to the ESA and the MMPA.  NMFS is also the agency to which the Secretary of Commerce has delegated the authority to manage federal fisheries pursuant to the Magnuson-Stevens Fishery Conservation and Management Act ("MSA").

23.     Defendant Eric Schwaab is the Assistant Administrator for Fisheries at NMFS, and has responsibility for implementing and fulfilling the agency's duties under the ESA, the MMPA, and the MSA.  Mr. Schwaab is sued in his official capacity.

24.     Defendant John Bryson is the Secretary of Commerce and has ultimate responsibility for the programs of NMFS.  Secretary Bryson is sued in his official capacity.

25.     Collectively, Defendants named in Paragraphs 22 through 24 shall be referred to as "Defendants" or "NMFS" in this complaint.

## LEGAL BACKGROUND

**The Endangered Species Act**

26.     In enacting the ESA, Congress recognized that certain species "have been so depleted in numbers that they are in danger of or threatened with extinction" and made it "the policy of Congress that all Federal . . . agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the Act. 16 U.S.C. § 1531(a)(2), (c)(1).  The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this [Act] are no longer necessary."  *Id.* § 1532(3).  The principal duties that the ESA assigns to the Secretary of Commerce for protecting marine species have been delegated to NMFS.  50 C.F.R. § 222.101(a).

27.     Under the ESA, a species is listed as "endangered" where it is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). Once listed, a species is entitled to a number of protections, including both prohibitions on harm and affirmative duties to promote the species' conservation and recovery.

28.     Specifically, Section 9 of the ESA prohibits any person from "taking" an endangered species, with limited exceptions. *Id.* § 1538(a)(1)-(2). A "person" includes private parties as well as local, state, and federal agencies. 16 U.S.C. § 1532(13). "Take" is defined broadly under the ESA to include harming, harassing, trapping, capturing, wounding, or killing a protected species either directly or by degrading its habitat sufficiently to impair essential behavior patterns. *Id.* § 1532(19). The ESA prohibits the acts of parties directly causing a take as well as the acts of third parties, such as governmental agencies, whose acts authorize or otherwise bring about the taking. *Id.* § 1538(g).

29.     In addition, Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

30.     To comply with Section 7(a)(2)'s substantive mandate, federal agencies must consult with NMFS or the United States Fish and Wildlife Service whenever their actions "may affect" a listed species and utilize the "best scientific and commercial data available" in doing so. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

31.     Where, as here, NMFS is both the action agency and the consulting agency, different branches of NMFS must undertake intra-agency consultation. Specifically, NMFS Sustainable Fisheries Division, which takes the action of authorizing the federal fisheries, must consult with NMFS Protected Resources Division. The result of this consultation is the

Protected Resources Division's preparation of a "biological opinion" that describes the expected impact of the operation of the American Lobster, Northeast Multispecies, Spiny Dogfish, and Monkfish Fishery on listed species, including endangered whales.  16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.

32.     The biological opinion must include a summary of the information on which the opinion is based, an evaluation of "the current status of the listed species," the "effects of the action," and "cumulative effects."  50 C.F.R. § 402.14(g)(2)-(3).  "Effects of the action" include both direct and indirect effects of an action "that will be *added to* the environmental baseline." *Id.* § 402.02 (emphasis added).  The environmental baseline includes "the past and present impacts of all Federal, State or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."  *Id.*  Cumulative effects include "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area."  *Id.*  Thus, NMFS must consider not just the proportional share of responsibility for impacts to the species traceable to the activity that is the subject of the biological opinion, but the effects of that action when *added to* all other activities and influences that affect the status of that species.

33.     After the consulting agency has added the direct and indirect effects of the action to the environmental baseline and cumulative effects, the consulting agency must make its determination of "whether the action is likely to jeopardize the continued existence of a listed species."  *Id.* § 402.14(h); 16 U.S.C. § 1536(b)(3)-(4).  A likelihood of jeopardy is found when "an action [] reasonably would be expected, directly or indirectly, to reduce appreciably the

10

likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.

34.     A biological opinion that concludes that the agency action is not likely to jeopardize the continued existence of a listed species but will result in take incidental to the agency action, also must include an incidental take statement ("ITS").  16 U.S.C. § 1536(b)(4). The ITS specifies the impact of any expected takes of individual members of the species, provides reasonable and prudent measures necessary to minimize the impact of those takes, and sets forth terms and conditions that must be followed to insure against jeopardy.  *Id.* § 1536(b)(4); 50 C.F.R. §§ 402.14(i)(1), (3).  When those listed species are marine mammals, however, the take must first be authorized pursuant to the Marine Mammal Protection Act.  *Id.* The take of a listed species in compliance with the terms of an ITS is not a prohibited take under Section 9 of the ESA. 16 U.S.C. §§ 1536(b)(4) and (o)(2); 50 C.F.R. § 402.14(i)(5).

35.     If NMFS determines in its biological opinion that the action is likely to jeopardize the continued existence of a listed species, the biological opinion must outline "reasonable and prudent alternatives" to the action, if any exist, that will avoid jeopardy.  16 U.S.C. 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3).

36.     Finally, the action agency has a continuing duty to insure against jeopardy under Section 7(a)(2).  After the issuance of a final biological opinion and "where discretionary Federal involvement or control over the action has been retained or is authorized by law," the agency must reinitiate formal consultation if, *inter alia*, : "(a) the amount or extent of taking specified in the incidental take statement is exceeded;" or "(b) new information reveals effects of the action that *may affect* a listed species. . . in a manner or to an extent not previously considered."  50 C.F.R. § 402.16 (emphasis added).

**The Marine Mammal Protection Act**

37.     Recognizing that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities," Congress passed the MMPA in 1972 to insure that marine mammals are "protected and encouraged to develop to the greatest extent feasible."  16 U.S.C. § 1361(1), (6).  The central purpose of the MMPA is to prevent marine mammal stocks from falling below their "optimum sustainable population" levels, defined as the "number of animals which will result in the maximum productivity of the population or the species, keeping in mind the carrying capacity of the habitat and the health of the ecosystem of which they form a constituent element."  *Id.* §§ 1361(2), 1362(9).

38.     To promote these objectives, the MMPA establishes a general moratorium on the taking of all marine mammals, 16 U.S.C. § 1371(a), expressly prohibits the unauthorized take of a marine mammal by any person, *id.* § 1372(a), and specifically requires NMFS to "prevent the depletion" of marine mammals from incidental take by commercial fisheries.  *Id.* § 1387(f)(1).  Prohibited takings include actions that kill or injure marine mammals or disrupt behavioral patterns, such as migration, breathing, breeding, or feeding.  16 U.S.C. § 1362(13), (18).

39.     A limited exemption for the incidental take of endangered marine mammals in the course of commercial fishing operations is provided for by Sections 101(a)(5) and 118 of the MMPA if specifically authorized by NMFS after the agency makes certain findings.  *Id.* §§ 1387(a)(2); 1371(a)(5)(E).

40.     Under Section 101(a)(5), NMFS can authorize the incidental take of listed marine mammals by commercial fishing operations for a three-year period provided it first finds, after public notice and comment, that the taking will have a "negligible impact" on the species, a

recovery plan has been or is being developed under the ESA, and, if required by Section 118, a monitoring plan and a take reduction plan are in place.  *Id.* § 1371(a)(5)(E).

41.     A negligible impact is one that "cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival."  50 C.F.R. § 216.103.

42.     Section 118, in turn, requires NMFS to develop a Take Reduction Plan ("TRP") for each "strategic stock" of marine mammals, including any ESA listed species.  *Id.* §§ 1387(f)(2); 1362(19).  The TRP is developed to reduce incidental take from commercial fisheries to below the potential biological removal level ("PBR") and to eventually reach the MMPA's zero mortality rate goal.  *Id.* § 1387(f)(2).  PBR is the maximum number of animals, not including natural mortalities, who may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population.  16 U.S.C. § 1362(20). Additionally, NMFS must amend the TRP as necessary to meet the requirements of the MMPA. *Id.* § 1387(f)(7)(F).

43.     Since 1997, the Atlantic Large Whale TRP has operated to reduce commercial fishing impacts on right, humpback, and fin whales.  *See* 50 C.F.R. § 229.32.  All fisheries that cause either frequent or occasional mortality or serious injury to Atlantic large whales must comply with the Atlantic Large Whale TRP.  16 U.S.C. § 1387(c)(3)(A)(iv); *see also* 75 Fed. Reg. 68,468 (Nov. 8, 2010) (listing fisheries that must comply in 2011).

44.     NMFS has adopted five criteria for making the requisite negligible impact determination.  *See* 75 Fed. Reg. 8,305, 8,307–8,308 (Feb. 24, 2010).  Under these criteria: (1) if the total amount of human-related serious injuries and mortalities are less than ten percent of PBR, NMFS would consider incidental take from fisheries to be a negligible impact; (2) if total

human-related serious injuries and mortalities are greater than PBR, and fisheries-related

mortality is less than ten percent of PBR, NMFS would consider incidental take from fisheries to

be a negligible impact if management measures are being taken to address non-fisheries-related

serious injuries and mortalities; (3) if total fisheries-related serious injuries and mortalities are

greater than ten percent of PBR and less than PBR and the population is stable or increasing,

NMFS would consider incidental take from fisheries to be a negligible impact subject to

individual review and certainty of data; (4) if the population abundance of a stock is declining,

the threshold level of ten percent of PBR will continue to be used, however if a population is

declining despite limitations on human-related serious injuries and mortalities below the PBR

level, a more conservative criterion is warranted; and finally; (5) total fisheries-related serious

injuries and mortalities greater than PBR cannot be considered a negligible impact. *Id.*

45.     Despite the existence of the TRP, NMFS has never made the required MMPA

Section 101(a)(5) "negligible impact" findings necessary to authorize the incidental take of right,

humpback, fin, and sei whales by the fisheries covered by the TRP.

**Fishery Management Acts**

46.     Pursuant to the Magnuson-Stevens Fishery Conservation and Management Act

("MSA"), regional fishery management councils propose fishery management plans ("FMPs") to

regulate catch in U.S. federal waters (3 to 200 nautical miles offshore).  16 U.S.C. § 1801(b)(4).

NMFS's MSA regulations implementing the Northeast Multispecies, Monkfish, and Spiny

Dogfish FMPs require fishing vessels to obtain a new permit each year in order to operate in

federal waters.  50 C.F.R. § 648.4(a).

47.     In addition to regulation pursuant to the MSA, the American Lobster Fishery is

also regulated pursuant to the Atlantic Coastal Fisheries Cooperative Management Act

("ACFCMA"), which coordinates coastal fisheries management in state waters.  16 U.S.C. §

5101 *et seq.*  NMFS has adopted ACFCMA regulations for the Lobster Fishery requiring that all

vessels obtain an annual permit to fish in federal waters.  50 C.F.R. § 697.4(a), (g).

**The Administrative Procedure Act**

48.     The Administrative Procedure Act ("APA") provides that "[a] person suffering

legal wrong because of agency action, or adversely affected or aggrieved by agency action

within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.

NMFS's 2010 Biological Opinions are agency actions within the meaning of the APA.

49.     The APA requires the reviewing court to "hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  *Id.* § 706(2).

## FACTUAL BACKGROUND

**Endangered Atlantic Large Whales**

50.     The North Atlantic right whale, the humpback whale, the fin whale, and the sei

whale are each endangered species impacted by the American Lobster, Northeast Multispecies,

Spiny Dogfish, and Monkfish Fisheries through entanglement in fishing gear.  Entanglement can

result in immediate death from drowning.  In a significant number of cases, however, the animals

die over an extended time period as they become incapacitated by injuries or infections caused

by the entanglement.  Gear often wraps whales' flippers, mouths, and tails and, particularly in

growing animals, cinches tighter over time.  Such injury often results in major tissue and bone

damage and systemic infection.  During this time the animals often lose weight, causing them to

sink when dead so that death from entanglement is often under-reported as a cause of death.

Scientists consider fishing gear entanglement to be a significant concern for large whales in terms of both species conservation and animal welfare.

51.     With a population of less than 400 individuals, the North Atlantic right whale (*Eubalaena glacialis*) is one the "the world's most critically endangered large whale species and one of the world's most endangered mammals." 73 Fed. Reg. 60,173 (Oct. 10, 2008).  Although the right whale has been listed as endangered since 1970, the species has not recovered.  *See e.g.,* NMFS, *Recovery Plan for the North Atlantic Right Whale (Eubalaena glacialis)* (Aug. 2004) at III-1 ("North Atlantic right whales face a high risk of extinction into the foreseeable future").  NMFS has identified entanglement in commercial fishing gear and ship strikes as the two primary anthropogenic factors retarding the North Atlantic right whale's recovery.  *Id.* at v.  NMFS has repeatedly stated that the "loss of even a single individual may contribute to the extinction of the species."  69 Fed. Reg. at 30,858.

52.     According to the most recent Final Stock Assessment Report for the right whale, approximately 75 percent of right whales are scarred at least once by fishing gear during their lifetimes, and between 14 and 51 percent of right whales are "involved in entanglements" *each year*.  NMFS, *2010 Stock Assessment for the North Atlantic Right Whale (Eubalaena glacialis)* at 13 (November 2010) (*Right Whale SAR*).  The PBR for the right whale is currently 0.7 whales. *Id.* at 11.  However, due to a math error (which NMFS proposes correcting in the 2011 Draft Stock Assessment Report), the PBR for the right whale should have been set at 0.4 whales.  *See* NMFS, *2011 Draft Stock Assessment for the North Atlantic Right Whale (Eubalaena glacialis)* at 5 (April 2011).  From 2004 to 2008, humans caused a minimum of 2.8 deaths or serious injuries of right whales per year, 0.8 of which were attributed to entanglements in fishing gear per year. *Right Whale SAR* at 12.

53.     Since NMFS issued its 2010 Biological Opinions, at least four adult right whales have died, two from injuries related to entanglement in fishing gear, one as the result of a ship strike, and one whose cause of death could not be determined.  Preliminary Results from  FY 2011 Southeast U.S. Right Whale Aerial Surveys. Compiled by LTJG Gregory Schweitzer, NOAA Corps and Barb Zoodsma, NOAA Fisheries Service. Provided via email to Southeast Implementation Team. April 2011.  NMFS believes that two right whale calves have also died— one newborn who was found abandoned and one whose mother had died—bringing the total to six dead right whales for 2011 alone.  In addition, there have been at least seven reports of previously unreported right whale entanglements.  Center For Coastal Studies and NOAA/NMFS 2011.  Atlantic Large Whale Disentanglement Network Update. Accessed October 21, 2011. However, as NMFS admits in its Stock Assessments Reports and 2010 Biological Opinions, many entanglement events go unobserved, so this is likely an underestimate.

54.     Endangered humpback whales (*Megaptera novaeangliae*) are also frequently entangled in fishing gear.  Humpback whales spend their summers feeding near the Northeast coast of the United States, including the Gulf of Maine.  Although most humpbacks migrate to the West Indies for mating and calving during the winter, numerous humpbacks have recently been sighted off the coast of the mid-Atlantic and Southeastern states during this time.  NMFS estimates the Gulf of Maine humpback whale population to be as low as 847 whales, and the agency has set the PBR for this humpback stock at only 1.1 whales per year.  NMFS, *2010 Stock Assessment for the Gulf of Maine Stock of Humpback Whales* at 23 (November 2010) (*Humpback SAR*).

55.     From 2004 through 2008, NMFS determined the minimum annual rate of human-caused death and serious injury to the Gulf of Maine humpback whale stock averaged 4.6

animals per year, 3.0 of whom were killed or seriously injured due to entanglement—almost

three times the PBR.  *Id.*  Research using entanglement-related scarring indicates that between 48

to 65 percent of the Gulf of Maine humpback population has experienced entanglements.  *Id.*

This same methodology indicates that the annual entanglement-related mortality rate of Gulf of

Maine humpback whales may be as high as 18.8 to 29.3 whales, depending on the assumptions

of population size.  Robbins, *et al*. Estimating entanglement related mortality from scar-based

studies. 2009. Scientific Committee Meeting of the International Whaling Commission.

SC/611BC3).  So far in 2011, NMFS has documented ten reports of previously unreported

humpback whale entanglements in fishing gear.  Center For Coastal Studies and NOAA/NMFS

2011. Atlantic Large Whale Disentanglement Network Update. Accessed October 21, 2011.

56.     Entanglement also threatens endangered fin whales (*Balaenoptera physalus*) and

sei whales (*Balaenoptera borealis*).  The North Atlantic fin whale, whose population ranges

from Nova Scotia to Cape Hatteras, includes only approximately 3,985 individual whales.

NMFS, *2010 Stock Assessment for the Fin Whale (Balaenoptera physalus)* at 32 (November

2010).  The 2010 Stock Assessment  reports an increase in overall documented serious injury and

mortality to fin whales from 2004 to 2008, with an average mortality rate of 3.2 per year, 1.2

deaths of which were attributed to fishery entanglements each year.  *Id.*  Although the rate of

serious injury and mortality due to entanglements in fishing gear is below PBR for the species,

NMFS admits that the total level of human-caused serious injury and mortality is unknown.  *Id*.

at 34.

57.     The estimated population of the Nova Scotia stock of sei whales (Balaenoptera

borealis borealis) is 386 individual whales, with a minimum population estimate of 208 whales.

NMFS, *2010 Stock Assessment for the Nova Scotia Stock of Sei Whales* at 37–38 (November

2010).  Between 2004 and 2008, fisheries killed or seriously or seriously injured an estimated 0.6

sei whales per year, which is above the PBR of 0.4 whales.  *Id.* at 38.

**The Four Federal Fisheries Analyzed in the 2010 Biological Opinions**

58.     Both trap/pot and gillnet fishing gear cause whale entanglements, and both the

vertical lines and groundlines associated with this fixed gear create entanglement risk.

Researchers have estimated that 56 percent of whales for which entangling gear could be

identified were entangled in vertical/buoy line, and 28 percent were entangled in groundline.

NMFS, *FEIS for Amending the Atlantic Large Whale Take Reduction Plan* at 2-41 (Aug. 2007).

59.     The American Lobster Fishery is the largest of the fixed-gear fisheries in the

Northeastern United States.  The Fishery operates from 3 to 200 miles from shore in waters from

Maine through Cape Hatteras, North Carolina, with the primary area of harvest in the Gulf of

Maine in depths up to 40 meters.  Although the Fishery uses multiple gear types, trap/pot gear

predominates, accounting for 98% of total landings between 1981 and 2007.  Atlantic large

whales are in danger of entanglements from trap/pot gear because they feed and travel in many

of the same areas as the Fishery operates.  The risk of entanglement occurs year-round, though

the risk may be greatest during the summer and fall, when both whales and the lobster gear are

the most concentrated in the same area.

60.     The Northeast Multispecies Fishery also occurs in federal waters from Maine to

Cape Hatteras, North Carolina.  The Fishery encompasses fifteen different species of groundfish

and uses multiple types of gear to harvest the fish.  Otter trawls are one of the primary gear

types, and gillnets, handlines, longlines, and fish pots are also used.  Atlantic large whales are at

risk of becoming entangled in the lines and nets that comprise gillnet gear because the whales

feed, travel and breed in many of the same ocean areas in the Multispecies Fishery action area.

19

61.     The Monkfish Fishery also occurs from Maine to Cape Hatteras, North Carolina, with the peak fishing season between November and June.  The types of gear predominately used are bottom trawls and bottom gillnets.  Trawl gear accounts for most of the landings in the northern area (75% during 2000–2006), while gillnets account for the majority of the landings in the southern area (54% during 2000–2006).  Atlantic large whales are at risk of becoming entangled in this gear throughout the season because whales feed, travel, and breed in many of the same areas used by the Monkfish Fishery.

62.     Spiny Dogfish are most abundant from Nova Scotia to Cape Hatteras, North Carolina and migrate seasonally, concentrating in U.S. waters during the fall through spring.  The Spiny Dogfish Fishery utilizes multiple gear types, though sink gillnets, bottom longlines, and bottom otter trawls are the primary commercial fishing gear used, and these accounted for approximately 96% of all dogfish landed in 2000-2004.  Sink gillnets have been the dominant gear type in the Spiny Dogfish Fishery according to NMFS landings data from 1988-1997.  NMFS has cited entanglements in gillnet gear as the greatest risk to whales from this Fishery.

**Regulation of Fishery and Endangered Whale Interactions**

63.     In 1997, NMFS adopted the first Atlantic Large Whale TRP to reduce commercial fishing impacts on whales, as required by the MMPA.  Fisheries regulated under the Northeast Multispecies, Monkfish, and Spiny Dogfish FMPs, and the Lobster Interstate FMP, cause frequent or occasional serious injury or death to right whales, humpback whales, and fin whales, and therefore must comply with the Atlantic Large Whale TRP.  16 U.S.C. § 1387(c)(3)(A)(iv); *See* 75 Fed. Reg. 68,468 (Nov. 8, 2010).

64.     Because NMFS Sustainable Fisheries Division authorizes the operation of these fisheries through implementation of the various FMPs and the MMPA, NMFS Sustainable

Fisheries Division as the action agency must consult with NMFS Protected Resources Division as the expert agency regarding the effects of the fisheries on listed species and insure that the fisheries are not likely to cause jeopardy under the ESA.  16 U.S.C. § 1536(a)(2).

65.     After a series of entanglements in the late 1990s, NMFS reinitiated ESA consultation to consider how the Lobster, Northeast Multispecies, Monkfish, and Spiny Dogfish Fisheries affect endangered whales.  The consultation resulted in four similar biological opinions, each concluding that existing conservation measures were inadequate to avoid the likelihood of jeopardy to right whales by the fisheries.  NMFS, *Biological Opinion re: Reinitiation of Consultation on the Federal Lobster Management Plan* at 102 (June 14, 2001); NMFS, *Biological Opinion re: Authorization of fisheries under the Northeast Multispecies Fishery Management Plan* at 107 (June 14, 2001); NMFS, *2001 Biological Opinion re: Authorization of fisheries under the Monkfish Fishery Management Plan* at 118 (June 14, 2001); NMFS, *2001 Biological Opinion re: Authorization of fisheries under the Spiny Dogfish Fishery Management Plan* at 102 (June 14, 2001).

66.     Because the 2001 Biological Opinions found a likelihood of jeopardy to right whales, NMFS was required to adopt a "reasonable and prudent alternative" ("RPA") that would avoid this result.  NMFS adopted the same RPA for each of the four fisheries, requiring fishing gear modification at the times and places whales are present, as well as monitoring.  The monitoring requirements specified what events would cause the RPA to be deemed ineffective and require reinitiation of consultation, in addition to the reinitiation criteria already established by the ESA regulations.

67.     For example, in the 2001 Lobster Biological Opinion, NMFS stated that the RPA would be deemed ineffective and reinitiation of consultation would be required if "a right whale

[is] killed or seriously injured in (1) gear that is marked as being used in the lobster fishery, (2) gear that is identifiable as being approved for use in a fishery authorized by the Lobster Management Plan, . . . (3) gear that cannot be identified as being associated with a specific fishery . . . [or (4)] [t]he estimated number of right whale entanglements in any gear or scarring . . . increases or remains the same [in any given year] as the lowest annual level of the three preceding years." *Id.* at 105–106.

68.     Notably, even with the RPAs, the 2001 Biological Opinions did not authorize any take of endangered whales. *See e.g.,* 2001 Lobster BiOp at 109 ("the incidental take level is set at zero (0) for marine mammals").  Rather, the 2001 Biological Opinions made clear that, "[g]iven the current critical status of the right whale population and the aggregate effects of human-caused mortality that has led to the species current status, the right whale population cannot sustain incidental mortality caused by the Federal lobster fishery." *Id.* at 101.  NMFS further recognized that it could not authorize any take pursuant to the MMPA because "the incidental take of endangered whales currently cannot be authorized under" Section 101(a)(5). *Id.* at 107.   NMFS made these conclusions after finding that "any entanglement that causes serious injury and mortality reduces appreciably the likelihood of survival and recovery of this species." *Id.* at 99.

69.     Despite the RPAs intended to avoid the take of even a single right whale, in 2002, eight more right whales were found entangled; three resulting in serious injury or mortality.  70 Fed. Reg. 35,894, 35,895 (June 21, 2005).  NMFS determined that one fatally entangled whale, right whale #3107, was entangled in vertical line "consistent with gear approved for use in the lobster industry."  *Id.*  Based on the RPA monitoring criteria set out in the 2001 Lobster

Biological Opinion, NMFS determined that the 2001 RPA was "not effective at avoiding the likelihood of jeopardy" and reinitiated consultation on the Lobster Fishery. *Id.* at 35,896.

70.     Two of the other right whales found entangled in 2002, right whale #1815 and right whale #3210, were deemed "seriously injured."  NMFS was unable to determine which specific fishery the entangling gear was from, but the entanglements nonetheless triggered reinitiation of consultation for all four fisheries pursuant to the 2001 RPA monitoring criteria.

71.     Due to continued entanglements and subsequent to litigation, NMFS amended the Atlantic Large Whale TRP in 2007.  72 Fed. Reg. 57,104 (Oct. 5, 2007).  NMFS again indicated that it would reinitiate consultation regarding the operation of the fisheries based on the new TRP amendments.  Although the amendments required important conservation measures, including the use of sinking groundline in many areas, NMFS acknowledged that further risk reduction measures are necessary.

72.     With the exception of 2005, NMFS discovered at least one right whale suffering serious injury or death as a result of entanglement each year since 2002, when the agency originally reinitiated consultation on the four fisheries.  In spite of these numerous serious injuries and deaths triggering reinitiation of consultation, NMFS failed to complete consultation for nine years until it issued the 2010 Biological Opinions on October 29, 2010, as required by a settlement agreement with Plaintiffs.

**The 2010 Biological Opinions**

73.     NMFS's Biological Opinions issued on October 29, 2010 analyzed the effects of the continued operation of: (1) the Lobster Fishery, (2) the Northeast Multispecies Fishery, (3) the Monkfish Fishery, and (4) the Spiny Dogfish Fishery.  Each of the 2010 Biological Opinions concludes that the continued operation of the particular fishery, in compliance with the

requirements of the Atlantic Large Whale TRP, "is likely to adversely affect, but not jeopardize the continued existence" of critically endangered North Atlantic right whales, as well as endangered humpback, fin, and sei whales.  NMFS, *Endangered Species Act Section 7 Consultation on the Continued Implementation of Management Measures for the American Lobster Fishery* at 132 (Oct. 29, 2010) (2010 Lobster BiOp); NMFS, *Endangered Species Act Section 7 Consultation on the Continued Implementation of Management Measures for the Northeast Multispecies Fishery* at 165 (Oct. 29, 2010) (2010 Multispecies BiOp); NMFS, *Endangered Species Act Section 7 Consultation on the Continued Implementation of Management Measures for the Monkfish Fishery* at 148 (Oct. 29, 2010) (2010 Monkfish BiOp); NMFS, *Endangered Species Act Section 7 Consultation on the Continued Implementation of Management Measures for the Spiny Dogfish Fishery* at 150 (Oct. 29, 2010) (2010 Spiny Dogfish BiOp).

74.     For these analyses, NMFS assumes that one right whale is seriously injured or killed each year as the result of U.S. fisheries.  However, because NMFS cannot attribute the serious injury or mortality to a particular federal fishery, NMFS "assumes that the serious injury or morality could and would occur as a result of the" particular fishery subject to the Biological Opinion, but that no takes will occur from other fisheries.  2010 Lobster BiOp at 114; 2010 Multispecies BiOp at 141; 2010 Monkfish BiOp at 125; 2010 Spiny Dogfish BiOp at 128.  As indicated in Paragraph 53 above, the amount of right whale take assumed in the 2010 Biological Opinions has already been exceeded.

75.     The 2010 Biological Opinions also assume that operation of U.S. fisheries will result in the death or serious injury of humpback, fin, and sei whales each year.  The 2010 Biological Opinions state that between 1999 and 2008, there was an average of 3.4 instances of

death or serious injury to humpback whales from entanglement.  However, NMFS also asserts that because this number included undocumented gear types, which could include non-fishery related gear such as anchor systems and mooring gear, a more accurate estimate of the serious injury or mortalities to humpback whales from U.S. Fisheries is 2.4 humpbacks per year.  The 2010 Biological Opinions also state that between 1999 and 2008, there were 0.8 documented instances of serious injury or mortality to fin whales and 0.3 documented instances of serious injury and mortality to sei whales.  The 2010 Biological Opinions assume that the continued operation of the federal fisheries will result in continued serious injury and mortality of fin and sei whales, but will not exceed the 1999–2008 averages.

76.     Although the 2010 Biological Opinions find that the operation of these federal fisheries will result in the take of endangered right, humpback, fin, and sei whales, they do not authorize such take under the ESA pursuant to an Incidental Take Statement "because the incidental take of ESA-listed whales has not been authorized under section 101(a)(5) of the MMPA [16 U.S.C. § 1371(a)(5)(E)]."  2010 Lobster BiOp at 134; 2010 Multispecies BiOp at 167; 2010 Monkfish BiOp at 150; 2010 Spiny Dogfish BiOp at 153.

77.     As part of their analyses, each opinion also examines the actions' impacts on recovery of the species.  In particular, each opinion specifically recognizes that "right whale recovery is negatively affected by anthropogenic mortality" and that from 2003–2007, right whales had the highest proportion of entanglement and ship strike events of any species of large whale.  2010 Lobster BiOp at 20–21; 2010 Multispecies BiOp at 25; 2010 Monkfish BiOp at 18–19; 2010 Spiny Dogfish BiOp at 18.  The 2010 Biological Opinions reiterate the conclusion in the revised Right Whale Recovery Plan that the most significant need for the right whale's recovery is "to reduce or eliminate deaths and injuries from anthropogenic activities, namely

shipping and commercial fishing activities." 2010 Lobster BiOp at 117; 2010 Multispecies BiOp at 144; 2010 Monkfish BiOp at 128; 2010 Spiny Dogfish BiOp at 130. Similarly, anthropogenic mortality of humpback whales "associated with fishing gear entanglements and ship strikes remains significant." 2010 Lobster BiOp at 27; 2010 Multispecies BiOp at 32; 2010 Monkfish BiOp at 25; 2010 Spiny Dogfish BiOp at 24.

78.     NMFS also cites a number of risk reduction measures, including ship speed restrictions and decreased fishing effort and assumes that such measures will help protect endangered whales. However, NMFS fails to consider the times and areas that do not receive the protection of ship speed restrictions, the impacts from exempted vessels, and the gross lack of compliance with the speed restrictions in the places they do apply. Moreover, NMFS relies on a number of non-regulatory risk reduction measures for risks from shipping, with which compliance is completely voluntary, including for example, Areas to be Avoided and the Dynamic Management Area Program. NMFS also fails to consider that while federal fishing restrictions may lead to an overall decrease in federal fishing efforts, fishing is actually increasing in areas in which whales are known to frequent. NMFS's assumption that these measures will be sufficiently protective of endangered whales is misplaced, as evidenced by a series of recent deaths and injuries.

**Significant Recent Events Since NMFS Issued the 2010 Biological Opinions**

79.     A series of recent deaths and entanglements of endangered whales since NMFS issued its 2010 Biological Opinions on October 29, 2010 not only underscores the fundamental flaws in the assumptions on which NMFS based its conclusions in the 2010 Biological Opinions, but also has triggered NMFS's duty to reinitiate consultation.

80.    On February 1, 2011 a right whale died from injuries related to entanglement in fishing gear.  On February 20, 2011 another right whale died whose cause of death could not be determined.  On March 16, 2011, a third right whale died from injuries related to entanglements in fish gear.  On March 27, 2011 a fourth right whale died as the result of a ship strike. Preliminary Results from  FY 2011 Southeast U.S. Right Whale Aerial Surveys. Compiled by LTJG Gregory Schweitzer, NOAA Corps and Barb Zoodsma, NOAA Fisheries Service. Provided via email  to Southeast Implementation Team. April 2011.  In addition, NMFS believes that two right whale calves have also died—one who was found abandoned and one whose mother had died—bringing the total to six dead right whales.  *Id.*

81.    There were also four reports of previously unreported right whale entanglements: on January 19, 2011 right whale #3010 was seen entangled; right whale #3712 was seen entangled on January 30, 2011; right whale #3760 was seen entangled on February 13, 2011; and another unidentified right whale was seen entangled "and thin" on February 13, 2011.  *Id.*

82.    In addition, there were two reports of previously unreported humpback entanglements, one on January 1, 2011 and humpback "EKG" on February 1, 2011.  *Id.*  NMFS, 2009–2011 Preliminary Large Whale Data. March 2, 2011.

83.    Despite these deaths, serious injuries and entanglements, NMFS failed to reinitiate consultation as to the effects of its continued authorization of federal fisheries.

84.    Accordingly, on April 29, 2011, Plaintiffs sent NMFS notice of their intent to sue NMFS for failing to insure that its actions do not jeopardize the continued existence of endangered whales, as required by the ESA, and for causing the unauthorized take of endangered whales.

85.     Since Plaintiffs sent their notice letter, three more right whales have been seen entangled in fishing gear for the first time.  One right whale was seen entangled in gillnet gear on September 19, 2011; right whale #3302 was seen entangled on September 26, 2011; and right whale #3111, was seen entangled in line on September 27, 2011.  Right whale #3893, who was seen entangled on April 19, 2011, was believed to be gear free as of May 5, 2011.  Center For Coastal Studies and NOAA/NMFS 2011. Atlantic Large Whale Disentanglement Network Update. Accessed October 21, 2011.

86.     In addition, eight humpback whales have been seen entangled in fishing gear for the first time.  These events occurred on June 1, 2011; July 8, 2011; July 11, 2011; July 12, 2011; September 15, 2011; September 30; 2011; and October 10, 2011.  *Id.*

87.     In sum, since NMFS issued its 2010 Biological Opinions, at least six right whales have died, two of whom died from entanglement-related injuries, and seven have been entangled in fishing gear for the first time.  At least ten humpback whales have also been entangled in fishing gear for the first time.  However, as NMFS admits, this is likely an underestimate due to the fact that many entanglement events go unobserved.

88.     Even though these recent deaths, serious injuries, and entanglements constitute new information triggering reinitiation of consultation, NMFS has yet to reinitiate or complete consultation on the continued operation of the Lobster, Northeast Multispecies, Monkfish, or Spiny Dogfish Fisheries.

## CLAIMS FOR RELIEF

<u>First Claim for Relief</u>

### Violation of the ESA
(Illegal Take of Endangered Species)

89.     Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this complaint.

90.     Section 9 of the ESA prohibits NMFS from authorizing activities that cause the unauthorized take of endangered species.  16 U.S.C. § 1538(g).

91.     The 2010 Biological Opinions acknowledge that take of four species of endangered whales—North Atlantic right whales, humpback whales, fin, and sei whales—will occur through operation of the fisheries, but do not include an Incidental Take Statement authorizing that take.  Thus, by authorizing the federal Lobster, Northeast Multispecies, Spiny Dogfish, and Monkfish Fisheries NMFS is "caus[ing]" the unauthorized take of endangered North Atlantic right whales, humpback whales, fin, and sei whales, in violation of Section 9 of the ESA, 16 U.S.C. § 1538(g).

### <u>Second Claim for Relief</u>

### Violations of the MMPA and APA
(Illegal Take of Marine Mammals)

92.     Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this complaint.

93.     The MMPA prohibits the unauthorized take of marine mammals.  16 U.S.C. §§ 1371(a); 1372(a).  Section 101(a)(5)(E) and Section 118 contain a limited exception to this otherwise broad prohibition whereby NMFS can authorize the incidental take of marine mammals by commercial fishing operations, provided NMFS first finds that, *inter alia*, such take

will have a "negligible impact" upon the species or stock of animals to be taken.  16 U.S.C. §§ 1371(a)(5)(E); 1387(a)(2).

94.     The 2010 Biological Opinions acknowledge that take of four species of endangered marine mammals—North Atlantic right whales, humpback whales, fin, and sei whales—will occur through operation of the American Lobster, Northeast Multispecies, Spiny Dogfish, and Monkfish Fisheries.   However, NMFS has not made the requisite negligible impact determination nor authorized the incidental take of right, humpback, fin, and sei whales by these fisheries as required by Section 101(a)(5)(E) and Section 118 of the MMPA.

95.     In order to make such a finding, NMFS would have to determine that the take "cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival."  50 C.F.R. § 215.203. However, NMFS cannot currently make such a finding for any of the endangered whales taken by operation of the federal fisheries, absent the adoption of additional conservation measures. Indeed, as NMFS has previously admitted in various Stock Assessment Reports, it cannot make the negligible impact finding for right whales because no mortality or serious injury of the stock can be considered insignificant and it cannot make the finding for the Gulf of Maine humpback whale because the total fisheries-related serious injuries and mortalities are greater than PBR. Nor can NMFS make the negligible impact finding for fin or sei whales because the total federal fishery-related mortality and serious injury is not less than 10 percent of the calculated PBR.

96.     NMFS's authorization of the operation of these federal fisheries without incidental take authorization under Section 101(a)(5)(E) is arbitrary, capricious, an abuse of discretion, and not in accordance with the MMPA, in violation of the APA.  5 U.S.C. § 706(2).

### Third Claim for Relief

### Violations of the ESA and APA
(Arbitrary and Capricious Biological Opinion)

97.     Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this complaint.

98.     Since NMFS issued the 2010 Biological Opinions on October 29, 2010, at least *six* right whales are thought to have died, *two* of whom died after being entangled in fishing gear. Preliminary Results from FY 2011 Southeast U.S. Right Whale Aerial Surveys. Compiled by LTJG Gregory Schweitzer, NOAA Corps and Barb Zoodsma, NOAA Fisheries Service. Provided via email to Southeast Implementation Team. April 2011.  Additionally, at least seven right whales have been entangled in fishing gear for the first time.  Center For Coastal Studies and NOAA/NMFS 2011. Atlantic Large Whale Disentanglement Network Update. Accessed October 21, 2011.  However, NMFS's "no jeopardy" determinations were based on the assumption that operation of the federal fisheries would result in only *one* death or serious injury of right whales per year.  These recent deaths, serious injuries, and entanglements demonstrate that NMFS's key assumption is erroneous.

99.     These events also demonstrate that NMFS's other assumptions in the documents, including its reliance on the benefits of ship speed restrictions and decreased fishing efforts in its evaluation of the environmental baseline and cumulative effects analysis, are misplaced.

100.     NMFS's 2010 Biological Opinions and its "no jeopardy" findings are arbitrary and capricious, and not in accordance with law, in violation of the APA.  5 U.S.C. § 706(2).

### Fourth Claim for Relief

**Violations of the ESA**
(Failure to Insure Against Jeopardy)

101.    Plaintiffs re-allege and incorporate, as if fully set forth herein, each and every allegation in the preceding paragraphs of this complaint.

102.   The deaths of endangered large whales that have occurred since NMFS issued the 2010 Biological Opinions on October 29, 2010 constitute "new information" that reveal "effects of the action that *may affect*" endangered whales "to an extent not previously considered" in the 2010 Biological Opinions and trigger the requirement that NMFS reinitiate formal consultation. 50 C.F.R. § 402.16(b) (emphasis added).

103.   NMFS has retained discretionary involvement or control over the federally-authorized Lobster, Northeast Multispecies, Monkfish, and Spiny Dogfish Fisheries.

104.    NMFS is in violation of Section 7(a)(2) of the ESA and its implementing regulations for failing to insure that the Lobster, Northeast Multispecies, Monkfish, and Spiny Dogfish Fisheries are not likely to jeopardize the continued existence of endangered North Atlantic right, humpback, fin, and sei whales.16 U.S.C. §§ 1536(a)(2), 1536(b); 1540(g)(1)(A); 50 C.F.R. § 402.16(b).


### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Find and declare that NMFS's continued authorization of the Lobster, Northeast Multispecies, Monkfish, and Spiny Dogfish fisheries violates Section 9 of the ESA by unlawfully "caus[ing]" the unauthorized take of endangered species, 16 U.S.C. § 1538(g);

2. Find and declare that NMFS's continued authorization of the American Lobster, Northeast Multispecies, Monkfish, and Spiny Dogfish Fisheries without a take authorization under the MMPA, 16 U.S.C. § 1371(a)(5)(E), is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2);

3. Find and declare that NMFS' 2010 Biological Opinions and their "no jeopardy" findings are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

4. Find and declare that NMFS is in violation of its duty under the ESA to insure that its continued authorization of the Federal Lobster, Northeast Multispecies, Monkfish, and Spiny Dogfish Fisheries is not likely to jeopardize the continued existence of any ESA-listed species, 16 U.S.C. § 1536(a)(2);

5. Order NMFS, through an injunction, to immediately reinitiate Section 7 consultation regarding the impacts of the federal Lobster, Northeast Multispecies, Monkfish, and Spiny Dogfish Fisheries on North Atlantic right whales, humpback whales, fin whales and sei whales, and issue new, legally valid biological opinions by a date certain;

6. Order NMFS, through an injunction, to immediately undertake the "negligible impact" analysis required by the MMPA, 16 U.S.C. § 1371(a)(5)(E), by a date certain;

7. Order NMFS, through an injunction, to implement any mitigation measures necessary to insure operation of the fisheries in compliance with the ESA, 16 U.S.C. § 1536(a)(2), and the MMPA, 16 U.S.C. § 1371(a)(5)(E), by a date certain;

8.  Award Plaintiffs their fees, costs, expenses, and disbursements, including reasonable attorneys' fees, associated with this litigation, as provided by 16 U.S.C. § 1540(g)(4) and 28 U.S.C. § 2412; and

9.  Grant such additional relief as the Court deems just and proper.

DATE: October 31, 2011

Respectfully Submitted,

/s/ Kimberly D. Ockene

Kimberly D. Ockene
MA BBO #638097
Senior Attorney
The Humane Society of the United States
131 Windermere Rd.
Auburndale, MA  02466
(617) 467-5842
kockene@humanesociety.org

*Counsel for Plaintiffs*